FILED

03/20/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0413

DA 21-0413

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2024 MT 63

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

ROBERT MURRAY GIBBONS,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Nineteenth Judicial District,
In and For the County of Lincoln, Cause No. DC-19-119
Honorable Matthew J. Cuffe, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

         Chad Wright, Appellate Defender, Deborah S. Smith, Assistant Appellate Defender, Helena, Montana

      For Appellee:

         Austin Knudsen, Montana Attorney General, Cori Losing, Assistant Attorney General, Helena, Montana

         Marcia Boris, Lincoln County Attorney, Libby, Montana

Submitted on Briefs:  September 20, 2023

Decided:  March 20, 2024

Filed:

                  Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 A jury found Robert Murray Gibbons (Gibbons) guilty of driving under the influence, fifth or subsequent offense on April 29, 2021. At sentencing, Gibbons received a five-year commitment to the Department of Corrections (DOC), and a $5,000 fine pursuant to § 61-8-731(3), MCA (2019). Gibbons appeals his conviction, arguing that the District Court gave the jury an incorrect instruction defining actual physical control and prejudiced his substantial rights by allowing the State to argue on rebuttal that Gibbons could have introduced photographic evidence produced during discovery or, in the alternative, that his counsel was ineffective for failing to introduce the photographs. Additionally, Gibbons challenges the sentencing statute, which imposed a mandatory minimum $5,000 fine, as facially unconstitutional.

¶2 We restate the issues as follows:

1. *Whether the District Court properly instructed the jury to consider, as part of the totality of the circumstances, that Gibbons need not be conscious to be in actual physical control of his vehicle.*

2. *Whether the State's rebuttal argument that Gibbons could have introduced photographic evidence equally available to him during discovery, and his counsel's failure to introduce the photographs at trial, violated Gibbons's substantive due process rights or his right to effective assistance of counsel.*

3. *Whether § 61-8-731(3), MCA (2019), which imposes a mandatory minimum $5,000 fine without regard to a defendant's ability to pay, is facially unconstitutional.*

We affirm Gibbons's DUI conviction, but we reverse the $5,000 fine. We hold that § 61-8-731(3), MCA, is facially unconstitutional because it requires imposition of a mandatory fine in every case without a trial court first considering constitutionally required

2

proportionality factors, such as the nature of the financial burden and the defendant's ability to pay. A statutorily mandated minimum fine prevents the trial court from considering in every case constitutionally and statutorily required factors embodied in the prohibition against excessive fines and fees of the United States Constitution, the Montana Constitution, and in Montana statutes implemented to protect against such a constitutional violation. We remand this case to the District Court for recalculation of Gibbons's fine consistent with this Opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3     On June 19, 2019, Gibbons drove his truck into Troy, parked on Yaak Avenue, and walked into the Home Bar, where he drank four rum and cokes. Richard Starks (Starks), a retired law-enforcement officer, was having dinner and a beer at the Home Bar and watched Gibbons, who appeared intoxicated, leaving the bar. Starks then followed Gibbons and watched him get into the driver's side of his truck. After Gibbons leaned over in the front seat, Starks called dispatch and reported a person was under the influence of alcohol and in his vehicle. Starks walked over to Gibbons's truck and took two pictures of him, one of which showed the key in the ignition, turned to the "on" position. Gibbons's feet rested in the driver's side footwell, with his rear end in the driver's seat and his body lying sideways along the bench seat, one arm folded under his head for support. The engine was not running.

¶4     Officer Travis Miller (Miller) responded to the call from dispatch and spoke briefly with Starks, who showed Miller the pictures on his phone. Miller then approached Gibbons's vehicle and saw him lying sideways on the bench seat with his head toward the

3

passenger seat. Miller knocked on the window and woke him up. When Miller asked Gibbons if he was sleeping and if he had been drinking, Gibbons responded affirmatively. Gibbons told Miller, "I can't drive." Miller administered several standard field sobriety tests, all of which indicated that Gibbons was impaired, and arrested Gibbons for driving under the influence. At the Lincoln County Detention Center, Gibbons agreed to take a breath alcohol test; it measured .136.

¶5 Gibbons's first jury trial on February 13, 2020, ended in mistrial after defense counsel objected to the State's questions during voir dire. At the second trial, Gibbons disputed he was in "actual physical control" of his vehicle, arguing that he never drove the vehicle and, as evidenced by his sleeping position in the cab, did not intend to drive it.

¶6 The State introduced into evidence the photographs Starks took of Gibbons in the front seat of the truck. Gibbons's counsel cross-examined Starks about the photographs and suggested that Gibbons's position in the vehicle evidenced his intention to sleep rather than drive, emphasizing that the picture showed Gibbons's arm folded under his head "for a pillow." During cross-examination of Miller and discussion of whether Gibbons was in actual physical control, defense counsel asked that Starks's photographs be published to the jury "so that any more questions can be maybe illuminated by them actually seeing the photos . . . ." Throughout the second trial, both defense counsel and the State questioned witnesses as to the significance of Gibbons's position on the seat and their opinion of whether this showed Gibbons was in actual physical control of the vehicle.

¶7 At the close of the trial, the District Court instructed the members of the jury that they "shall consider the following factors, including but not limited to . . . 5) that the

4

Defendant need not be conscious to be in actual physical control." The jury became hopelessly deadlocked, and the District Court declared a mistrial.

¶8 At the third trial, defense counsel's opening argument focused again on the concept of actual physical control and analogized Gibbons's decision to sleep to the actions of a passenger. Counsel said during opening statements that the jury "should get a picture, actually, of exactly where [Gibbons] was, and I think that picture is going to show [the jury] that he's laying across the front seat of his vehicle." The State called Starks as a witness, but it did not discuss or introduce the photographs Starks took of Gibbons. During cross-examination, counsel asked about the pictures and how they depicted Gibbons in the vehicle. Starks confirmed that he had taken two photographs of Gibbons lying in the cab of the pickup. When asked where Gibbons's hands were located in the picture, Starks replied that he could not recall. Defense counsel could not find the photographs and was unable to introduce them into evidence during cross-examination. In a sidebar discussion regarding counsel's mention of Starks's prior testimony, defense counsel expressed surprise that the State decided not to introduce the pictures.

¶9 During Miller's testimony, the State introduced a short segment of the officer's body camera footage as a demonstrative exhibit of his initial contact with Gibbons. The recording showed Gibbons lying down in the truck and sitting up in the driver's seat when he heard Miller knock. Miller also testified as to specific aspects of Gibbons's position and confirmed that in the photograph, one of Gibbons's hands was resting under his head like a pillow.

¶10 Before closing statements, the State moved to preclude argument about the photographs because it would suggest that the State improperly withheld evidence and encourage the jury to speculate about what the pictures might have shown. Defense counsel argued that preventing mention of the photographs would shift the burden of proof to Gibbons and that pointing out the State's decision not to introduce photographs taken by its own witness was "absolutely fair game" to demonstrate that the State had not met its burden of proof. The District Court ruled that the parties could not describe what was in the pictures because they were not in evidence, but the defense could argue that the State did not introduce them and discuss the witnesses' testimony about them. However, if the defense chose to do so, the State could respond that Gibbons also had access to the photographs and opportunity to present them.

¶11 During closing, Gibbons's counsel argued that the facts of Gibbons's case did not amount to actual physical control:

> [W]here in the vehicle was the Defendant located? Starks took photos of the Defendant, photos from the other side. He said, I can't remember exactly where his hands are. I guess they could have been up underneath his head, but I don't know.
>
> The State's had those photos. Officer Miller testified, I saw them in the last month. They didn't bring them in even after I asked about them.
>
> It's their burden to prove their case. I'm not going to bring in evidence. That's not my burden. We talked about the burden of proof and that it's entirely at [the State's] table. You know, for them to have clear photos of exactly this Defendant's position, where exactly his head was, they're not going to bring that in. Instead, they're just going to get up here and argue, he was in the driver's seat.
>
> Well, is that really intellectually honest when you've got someone -- clearly, even in the video we saw that the officer raps on the window. The defendant

6

gets up. We don't know exactly where his butt is. We know where the head is. His head isn't in the driver's seat. His shoulders ain't in the driver's seat. The driver's seat ain't that wide for you to be laying down completely in the driver's seat.

¶12 In rebuttal, the State responded that the defense had been provided with the photographs over a year ago and could have presented them if defense counsel "truly believed" they were helpful to Gibbons's case. The State further referenced the jury instruction that witness testimony alone is sufficient to establish a fact, such as Gibbons's position in the truck. The prosecutor concluded by posing a rhetorical question similar to the defense's, asking the jury to consider "who is being intellectually dishonest here."

¶13 The District Court issued a jury instruction resembling the one issued in the second trial, using some of the example factors listed in *State v. Sommers*, 2014 MT 315, 377 Mont. 203, 339 P.3d 65, for actual physical control:

> The Defendant is "in actual physical control" of a motor vehicle if the individual is not a passenger, and is in a position to cause the vehicle to move, or control the vehicle's movement in some manner or direction. The jury shall consider the totality of the circumstances including, but not limited to, [the] following factors:
>
> (1) where in the vehicle the defendant was located;
> (2) whether the ignition key was in the vehicle, and where the key was located;
> (3) whether the engine was running;
> (4) where the vehicle was parked and how it got there; and
> (5) that the Defendant need not be conscious to be in actual physical control.

¶14 Gibbons objected that the fifth factor, "the Defendant need not be conscious[,]" relied on case law with inapposite factual scenarios in which the defendants had driven a vehicle while impaired and subsequently passed out or fell asleep. Because the State did

7

not allege that Gibbons had driven the truck, the defense argued that this factor did not apply. Ultimately, the District Court kept the instruction because the language, taken from *Sommers*, identified consciousness as "one of the factors to be considered in [the jury's] review of the totality of the circumstances." The jury returned a guilty verdict.

¶15 The Presentence Investigation Report (PSI) indicated Gibbons had been enrolled in several alcohol treatment programs under supervised release with varying degrees of success. Gibbons was unhoused and "currently camping," as he lived in the camper attached to his truck and drove it often to different locations. In the winter months, Gibbons typically drove his truck and camper to Arizona and visited his sister. Gibbons had a total monthly income of approximately $1,431 from a small pension payment of $130 and social security income of $1,300. He was $9,000 in debt.

¶16 At the outset of the sentencing hearing, the judge asked if any of the terms of supervision in the PSI did not relate to Gibbons or would be unreasonable as applied to him. Defense counsel responded, "I don't believe so, I think we would be asking the Court to not fully impose some of the fines and fees due to an inability to pay, but that's all." During the sentencing hearing, the District Court did not ask Gibbons about his ability to pay a monetary penalty, and Gibbons's testimony at the hearing did not address his financial circumstances.

¶17 The State asked for a five-year commitment to the DOC, a $5,000 fine, and forfeiture of Gibbons's vehicles. Defense counsel objected to the State's request for vehicle forfeiture and recommended only a five-year suspended sentence. The District Court ultimately sentenced Gibbons to a five-year commitment to the DOC and, under

8

§ 61-8-731(3), MCA, fined him what the sentencing judge characterized as "the minimum of $5,000, the statutory minimum." It declined to impose any other financial penalties, including vehicle forfeiture.

## STANDARDS OF REVIEW

¶18 We review a district court's ruling on jury instructions for abuse of discretion. *State v. Christiansen*, 2010 MT 197, ¶ 7, 357 Mont. 379, 239 P.3d 949 (citing *State v. Archambault*, 2007 MT 26, ¶ 25, 336 Mont. 6, 152 P.3d 698). Our review focuses on whether the instructions, considered as a whole, fully and fairly instruct the jury on the applicable law. *Sommers*, ¶ 14. A district court has broad discretion to formulate jury instructions, and for the error to be reversible, the instructions must prejudicially affect the defendant's substantial rights. *State v. Hudson*, 2005 MT 142, ¶ 10, 327 Mont. 286, 114 P.3d 210 (citing *State v. Goulet*, 283 Mont 38, 41, 938 P.2d 1330, 1332 (1997)). This Court will not find prejudice where "the jury instructions in their entirety state the applicable law of the case." *State v. Iverson*, 2018 MT 27, ¶ 10, 390 Mont. 260, 411 P.3d 1284 (internal citations omitted).

¶19 This Court generally reviews a district court's evidentiary ruling for abuse of discretion. *State v. Hudon*, 2019 MT 31, ¶ 16, 394 Mont. 226, 424 P.3d 273. However, "[t]o the extent the court's ruling is based on a . . . constitutional right, our review is de novo." *Hudon*, ¶ 16 (quoting *State v. Given*, 2015 MT 273, ¶ 23, 381 Mont. 115, 359 P.3d 90). Record-based claims of ineffective assistance of counsel present mixed questions of law and fact that we review de novo. *State v. Kirn*, 2023 MT 98, ¶ 17, 412 Mont. 309, 530 P.3d 1 (internal citations omitted).

¶20 "We review criminal sentences for legality." *State v. Yang*, 2019 MT 266, ¶ 8, 397 Mont. 486, 452 P.3d 897 (citing *State v. Coleman*, 2018 MT 290, ¶ 4, 393 Mont. 375, 431 P.3d 26). A claim that a criminal sentence violates a constitutional provision is reviewed de novo. *Yang*, ¶ 8.

## DISCUSSION

¶21 *Issue One: Whether the District Court properly instructed the jury to consider, as part of the totality of the circumstances, that Gibbons need not be conscious to be in actual physical control of his vehicle.*

¶22 Since 1955, Montana's DUI statute has prohibited having "actual physical control" of a vehicle while intoxicated. *Sommers*, ¶ 20 (citing 1955 Mont. Laws ch. 263 (34th Legislative Assembly, Senate Bill 59), enacted as § 32-2142(1)(a), RMC (1947)). The "actual physical control" language works as a prophylactic measure "based on the policy of deterring intoxicated people from assuming physical control of a vehicle, *even if they never actually drive*." *Sommers*, ¶ 20 (quoting *Larson v. State*, No. A-10461, 2010 WL 3611440, 2 (Alaska App. Sept. 15, 2010)) (emphasis added). Exerting actual physical control of a vehicle while under the influence of alcohol, an act no less criminal than *driving* while intoxicated, is nonetheless highly fact-dependent and does not lend itself to bright-line determinations. *See Christiansen*, ¶ 10 (reversing a defendant's DUI conviction due to a confusing jury instruction on actual physical control).

¶23 In *Sommers*, we recognized that actual physical control is a "fact-intensive inquiry which may require consideration of a wide variety of circumstances." *Sommers*, ¶ 33. Thus, this Court adopted a totality-of-the-circumstances test so that juries could consider a variety of "difficult-to-foresee situations which may nonetheless support a determination

10

that the defendant was in actual physical control of the vehicle." *Sommers*, ¶¶ 33-34. As a result, we have discouraged stand-alone use of statements taken out of context from other inapposite cases and instead invited courts to include various factors tailored to each situation for the jury's consideration of the totality of the circumstances. *Sommers*, ¶¶ 28, 35. Among these is the fact, grounded in Montana case law and legislative history, that a defendant "need not be conscious to be in actual physical control." *Sommers*, ¶ 35 (internal citations omitted).

¶24 Like in *Sommers*, the State did not allege that Gibbons drove while intoxicated but instead presented evidence that Gibbons was in "actual physical control" of the truck in violation of § 61-8-401(1)(a), MCA (2019). The jury instruction we held to be unlawful in *Sommers* stated, without exception, "[i]t *does not matter* that the vehicle is incapable of moving." *Sommers*, ¶ 18 (emphasis added). This instruction removed a key aspect of Sommers's defense from the jury's consideration: the fact that his vehicle was completely disabled and incapable of moving when the defendant entered it to stay warm while awaiting a ride home.

¶25 In contrast, the instruction offered here told the jury to consider the totality of the circumstances, one factor of which was that Gibbons *need not* be conscious to be in actual physical control. Not only was this given as one of several factors under the overarching instruction that the jury should consider all the circumstances, not limited to the list presented, but also, Gibbons's instruction did not have the same preclusive effect of the instruction in *Sommers*. There, the instruction prevented jurors from considering at all the fact that Sommers's vehicle was incapable of movement, as opposed to the permissive

11

statement in Gibbons's instruction that the defendant *need not* be conscious to be in actual physical control. The instruction thus allowed the jury to find that Gibbons had actual physical control despite the fact that he was asleep, but it did not require the jury to do so or prevent the jury from considering Gibbons's defense.

¶26 This Court has determined that the purpose of the phrase "actual physical control" is to "prevent DUI at its inception" and to allow drunk drivers to be apprehended before they harm others. *Sommers*, ¶ 20 (citing 92 A.L.R. 6th 295, § 7 (2014) (collecting cases)). Gibbons contends that the consciousness instruction applies only when defendants first drove a vehicle while intoxicated, wrecked or parked it, and then passed out or fell asleep, and therefore, the instruction was confusing and inaccurate in his case. *See State v. Taylor*, 203 Mont. 284, 661 P.2d 33 (1983) (defendant did not relinquish actual physical control when he mired the vehicle in a borrow pit while intoxicated and then fell asleep); *State v. Ruona*, 133 Mont 243, 321 P.2d 615 (1958) (defendant drove the vehicle while intoxicated and was apprehended after parking it and falling asleep). However, Gibbons's argument does not take into account the purpose of the statute's "actual physical control" language, which focuses on preventing and deterring drunk driving before it occurs.

¶27 Furthermore, the actual physical control inquiry focuses not on the defendant's *intent* to drive (DUI is a strict liability offense), *Hudson*, ¶ 15, but on the defendant's *ability* to control the vehicle's movement: "one could have 'actual physical control' while merely parking or standing still so long as one was keeping the car in restraint or in position to regulate its movements." *Ruona*, 133 Mont. at 248, 321 P.2d at 618. Most aptly, we have analogized that "[j]ust as a motorist remains in a position to regulate a vehicle while asleep

12

behind its steering wheel, so does he remain in a position to regulate a vehicle while asleep behind the steering wheel of a vehicle stuck in a borrow pit." *Taylor*, 203 Mont. at 287, 661 P.2d at 34. Naturally, the reverse is also true: a motorist sleeping behind the wheel who has *not* already wrecked his vehicle while intoxicated is just as much in control of the vehicle as one who has.

¶28 The facts in *Robison* are illustrative. Robison was found alone, admittedly intoxicated, asleep or passed out in the front seat of a vehicle, with the lights on and engine running. *State v. Robison*, 281 Mont. 64, 65, 931 P.2d 706, 707 (1997). Robison contended that from the waist up, his body was "occupying the passenger's seat with his legs sprawled on the driver's side" and that another witness had driven the vehicle, not the defendant. *Robison*, 281 Mont. at 65, 931 P.2d at 707. The problem in *Robison* was not that a jury could never have found the defendant guilty under these circumstances. In fact, *Robison* clarified many times that a jury could have found the defendant guilty of DUI if it "disbeliev[ed] Robison's and Rutledge's testimony that Rutledge, not Robison, was *at all times* the driver of the automobile." *Robison*, 281 Mont. at 68, 931 P.2d at 708 (emphasis added). Rather, the problem lay in the incorrect jury instruction that any person "physically inside an operational motor vehicle with the potential to operate or drive that motor vehicle . . ." met the definition of actual physical control. *Robison*, 281 Mont. at 66, 931 P.2d at 707. We held that the instruction impermissibly broadened the definition of actual physical control to include passengers: those who are *not* in a position to exercise "dominion, directing influence or regulation of the vehicle." *Robison*, 281 Mont. at 67, 931 P.2d at 708.

¶29 Gibbons, on the other hand, does not allege that a different person had control of the vehicle. It is uncontested that Gibbons was alone, intoxicated, and asleep in his truck, where he himself put the key in the ignition and turned it to the "on" position. It is uncontested that his legs were in the driver's side footwell of the truck, with his rear end in the driver's seat. Nothing in the instructions prevented the jury from considering all the facts presented at trial, including Gibbons's argument that his sleeping position indicated he had no intention to use the vehicle to drive and thus was not exercising actual physical control. Had the instruction indicated "it did not matter" that Gibbons was unconscious, like the instruction in *Sommers*, the jury would have been prevented from considering the facts most central to Gibbons's defense. But, the instruction accurately stated that a defendant can be unconscious and still retain actual physical control, without limiting the jury's evaluation of all the factual circumstances.

¶30 Gibbons argues that this Court has never upheld a DUI conviction where it was not alleged that the defendant actually drove the vehicle under the influence. This does not change the fact that a defendant undoubtedly can be guilty of DUI for merely exercising "actual physical control" under the plain terms of the statute, and he need not drive the vehicle anywhere in order for the jury to find him so. Instructing the jury that Gibbons need not be conscious to have actual physical control aligns with the preventative purpose of the statute's language, the definition of actual physical control in Montana's case law, the totality of the circumstances approach we adopted in *Sommers*, and the specific facts of Gibbons's case. The instruction did not mislead the jury, misstate the law, or prejudice Gibbons's ability to mount a complete defense.

14

¶31    *Issue Two: Whether the State's rebuttal argument that Gibbons could have introduced photographic evidence equally available to him during discovery, and his counsel's failure to introduce the photographs at trial, violated Gibbons's substantive due process rights or his right to effective assistance of counsel.*

¶32    Gibbons argues that the District Court's decision to allow the State's rebuttal argument about the photographs violated numerous constitutional rights, including his right to due process, to the presumption of innocence, to a complete defense, and to a fundamentally fair trial by an impartial jury. The crux of Gibbons's argument, however, is that the State's comments shifted the burden of proof by requiring Gibbons to produce evidence of his innocence. Alternatively, Gibbons argues that defense counsel's failure to introduce the photographs into evidence violated his right to effective assistance of counsel. The State contends, and we agree, that responding to Gibbons's overt statement that the State improperly withheld the photographs from the jury does not undermine the presumption of innocence. Furthermore, even if both arguments are true, Gibbons suffered no prejudice as a result.

¶33    Criminal defendants are guaranteed substantive due process rights to a fair trial, including the presumption of innocence, protection against self-incrimination, and the requirement that the State prove every element of a charged offense. U.S. Const. amend. XIV; Mont. Const. art. II, § 17 (Montana due process clause); *State v. Miller*, 2022 MT 92, ¶ 21, 408 Mont. 316, 510 P.3d 17 (internal citations omitted); *In re Winship*, 397 U.S. 358, 363-64, 90 S. Ct. 1068, 1072-73 (1970). A defendant's fundamental due process rights "implicate a number of highly nuanced restrictions on the otherwise broad latitude that prosecutors have in eliciting and commenting on the evidence" in a criminal trial. *Miller*,

15

¶ 22. However, a prosecutor may properly comment on the "nature, quality, or effect of the evidence in relation to the applicable law and the prosecutor's burden of proof." *Miller*, ¶ 22 (internal citations omitted).

¶34 When a prosecutor's conduct deprives the defendant of a fair and impartial trial, the conviction is subject to reversal. *State v. Wellknown*, 2022 MT 95, ¶ 22, 408 Mont. 411, 510 P.3d 84 (internal citations omitted). "We review alleged improper statements during a closing argument in the context of the entire argument; we do not presume prejudice from the alleged misconduct, and the burden is on the defendant to show the argument violated his substantial rights." *Wellknown*, ¶ 22 (quoting *State v. Smith*, 2021 MT 148, ¶ 42, 404 Mont. 245, 488 P.3d 531 (internal citations omitted)). We have found a prosecutor's closing remarks to be improper when "repeated use of burden of proof language . . . in reference to what the defendant could have done" risks diminishing the State's burden of proof in the minds of the jurors. *Wellknown*, ¶ 24 (quoting *State v. Favel*, 2015 MT 336, ¶ 26, 381 Mont. 472, 362 P.3d 1126).

¶35 Criminal defendants have the right to effective assistance of counsel guaranteed by the U.S. and Montana Constitutions. U.S. Const. amends. VI and XIV; Mont. Const. art. II, § 24. "This Court evaluates claims of ineffective assistance of counsel using the test in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984)." *State v. Gieser*, 2011 MT 2, ¶ 9, 359 Mont. 95, 248 P.3d 300. A defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced him. *State v. McAlister*, 2016 MT 14, ¶ 7, 382 Mont. 129, 365 P.3d 1062 (internal citations omitted).

16

¶36 In *State v. Hudon*, this Court held that a district court's decision to limit the defense's closing argument that the State presented incomplete evidence did not unlawfully shift the burden of proof. *Hudon*, ¶ 26. There, the defendant sought to "'accuse[] or suggest' the prosecution had failed to provide evidence in discovery." *Hudon*, ¶ 26. The evidence in question included detailed blood test results, employee credentials, and lab workers' notes from the defendant's blood alcohol testing, which were accessible to both the State and the defense. Though the subject of incomplete evidence was "a generally appropriate subject for argument," the district court had already established that no discovery violation occurred. *Hudon*, ¶ 26. Thus, we held that the defense's rhetorical question asking the jury to consider why the State did not provide more detailed evidence constituted "continued efforts, despite the ruling, to establish or imply the prosecution was hiding something, when in reality the defense had failed to obtain the additional evidence it desired." *Hudon*, ¶ 26.

¶37 Here, unlike in *Hudon*, the District Court allowed the defense to argue that the photographs showed the State had not met its burden of proof but warned that the prosecutor could respond that the defense had the same access to the evidence. The defense then accused the State of intellectual dishonesty for its decision not to introduce the photographs. The argument that the State had not met its burden of proof was, indeed, "absolutely fair game" for the defense in closing, but the State may also respond that it has met its burden of proof without violating a defendant's due process rights. The State was not obligated to introduce photographic evidence equally available to the defense, particularly when the detailed testimony and cross-examination of two witnesses and visual

17

evidence from Miller's body camera footage established Gibbons's position in the vehicle at the time of the incident. The District Court did not prevent Gibbons from arguing in closing that the State's decision not to present the photographs as evidence meant it had not met its burden of proof. Gibbons's counsel made exactly this argument but further accused the State of intellectual dishonesty. In kind, the State responded that the evidence they provided met the burden of proof and that Gibbons had equal access to the photographs, which was proper rebuttal to the accusation of dishonesty.

¶38 These statements are far from the "repeated use" of burden shifting language found in *Wellknown* and *Favel*, both of which held that the State may not imply that defendants must prove their own innocence. *Wellknown*, ¶ 23 (the State's closing remarks that the defendant "*chose not to show the officers that he was not under the influence*" improperly shifted the burden of proof) (emphasis in original); *Favel*, ¶ 26 ("[T]he comments complained of in this case—that Favel could have 'proven her innocence' by submitting to a breath test—have the potential to blur the distinction between a defendant's state of mind and the State's burden of proof."). None of the prosecution's statements implied that Gibbons's failure to introduce the photographs meant he was guilty, nor did they otherwise force Gibbons to prove his own innocence.

¶39 Even if the State's remarks had somehow shifted the burden of proof, the evidence against Gibbons was largely uncontested. Gibbons conceded that he was sleeping in the front seat because he was too intoxicated to drive. His defense relied entirely on the idea that he entered the vehicle only with the intention of sleeping and that as a result, he was not exercising actual physical control. The State's own witnesses offered testimony that

18

Gibbons was using his arm "like a pillow." The prosecutor's closing remarks are therefore unlikely to have improperly influenced the jury.

¶40     Gibbons's ineffective assistance argument fails for much the same reason: he cannot show that his counsel's failure to introduce the photographs prejudiced his defense. Prejudice occurs only when the defendant can show a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Gieser*, ¶ 14 (citing *Strickland*, 466 U.S. at 703, 104 S. Ct. at 2072). "A defendant must do more than just show that the alleged errors of a trial counsel had some conceivable effect on the outcome of the proceeding." *State v. Dineen*, 2020 MT 193, ¶ 25, 400 Mont. 461, 469 P.3d 122 (internal citations omitted).

¶41     Gibbons argues the deadlocked jury at his second trial shows that the pictures were critical to his defense. However, we can find no appreciable difference between the admitted evidence of Gibbons's position provided by witness testimony and video footage and that of the two unadmitted photographs. In fact, Gibbons's counsel and Officer Miller characterized the pictures as "maybe just a slightly different angle" of what the jury saw from Miller's body camera video. Miller also confirmed during direct and cross-examination that Gibbons was lying down with his feet in the driver's side footwell, rear end in the driver's seat, and head and torso on the bench seat toward the passenger side. Miller testified to the defense's key fact that Gibbons's arm was resting underneath his head when he approached the vehicle and that the photographs also showed his hand under his head "like a pillow." Thus, the defense was able to utilize this description and make a similar closing argument about Gibbons's intention to sleep. Essentially, the State

19

and Gibbons agreed entirely on his physical position in the truck but disagreed about whether this position indicated he had actual physical control.

¶42 Even if failing to find and introduce the photographs rose to the level of unconstitutionally deficient performance on the part of defense counsel, Gibbons cannot show a reasonable probability that introducing the photographs would have changed the outcome of his trial. The testimony and video evidence provided to the jury allowed the defense to describe in detail how each aspect of Gibbons's physical position weighed against finding that he had actual physical control. The jury convicted Gibbons nonetheless, and we cannot find that admitting the photographs would have altered this outcome.

¶43 *Issue Three: Whether § 61-8-731(3), MCA (2019), which imposes a mandatory minimum $5,000 fine without regard to a defendant's ability to pay, is facially unconstitutional.*

¶44 Gibbons appeals the fine imposed by the District Court and argues that in every instance in which the sentencing court fines a defendant under § 61-8-731(3), MCA (2019), the $5,000 minimum—when it is imposed in violation of § 46-18-231(3), MCA, without consideration of the offender's resources, the nature of the crime committed, and the nature of the burden created by the fine—violates both § 46-18-231(3), MCA, and the right to be free from excessive fines embodied in the U.S. Const. amend. VIII and Mont. Const. art. II, § 22.

¶45 We begin with the two statutes at issue, and some general rules of statutory construction. Sections 46-18-231(1)(a) and (3), MCA, address the imposition of fines and fees in all felony and misdemeanor cases. Section 46-18-231(1)(a), MCA, provides:

Except as provided in subsection (1)(b), *whenever*, upon a verdict of guilty or a plea of guilty or nolo contendere, an offender has been found guilty of an offense for which a felony penalty of imprisonment could be imposed, the sentencing judge may, in lieu of or in addition to a sentence of imprisonment, impose a fine *only* in accordance with subsection (3). (Emphasis added.)

Subsection (3) of 46-18-231, MCA, instructs that:

The sentencing judge *may not sentence an offender to pay a fine unless the offender is or will be able to pay the fine and interest*. In determining the amount and method of payment, the sentencing judge *shall* take into account the nature of the crime committed, the financial resources of the offender, and the nature of the burden that payment of the fine and interest will impose. (Emphasis added.)

Section 46-18-231, MCA, thus, clearly and plainly requires that a sentencing judge, "whenever" an offender has been found guilty of a felony or misdemeanor, may "only" impose a fine when the offender is able to pay and "shall" consider the offender's resources and the nature of the burden payment of the fine will impose. Notably, § 46-18-231, MCA, applies to all convictions where a fine may be imposed and makes no exceptions for statutes that establish a minimum mandatory fine.

¶46 Consistent with the Legislature's judgment that a fine not be imposed on an offender unable to pay, the Legislature has also established the exact same requirements before a sentencing judge may impose costs. While a defendant may be required to pay costs in a felony or misdemeanor case, "[t]he court may not sentence a defendant to pay costs unless the defendant is or will be able to pay them." Section 46-18-232, MCA. "In determining the amount and method of payment of costs, the court shall take into account the financial resources of the defendant, the future ability of the defendant to pay costs, and the nature of the burden that payment of costs will impose." Section 46-18-232, MCA.

21

¶47 These statutes yield a consistent rule: a sentencing court is authorized to order a fine or cost only if the offender has the ability to pay and only after the sentencing judge considers the nature of the offense, the financial resources of the offender, and the nature of the burden the fine will impose. "Statutory construction is a 'holistic endeavor' and must account for the statute's text, language, structure, and object." *State v. Heath*, 2004 MT 126, ¶ 24, 321 Mont. 280, 90 P.3d 426 (citations omitted). "Our purpose in construing a statute is to ascertain the legislative intent and give effect to the legislative will." *Heath*, ¶ 24. Further, our inquiry must begin with the words of the statutes themselves. "The legislative intent is to be ascertained, in the first instance, from the plain meaning, of the words used." *Western Energy Co. v. Dept. of Revenue*, 1999 MT 289, ¶ 11, 297 Mont. 55, 990 P.2d 767. Here, the text, language, structure, and object of § 46-18-231, MCA, is clear and giving effect to legislative intent is straightforward. The Legislature, through § 46-18-231, MCA, intended that the imposition of a fine be proportionate to the financial resources of an offender.

¶48 The principal of proportionality forms the touchstone to the consideration of a fine's excessiveness. *United States v. Bajakajian*, 524 U.S. 321, 333-34, 118 S. Ct. 2028, 2036 (1998); *State v. Wilkes*, 2021 MT 27, ¶ 26, 403 Mont. 180, 480 P.3d 823. A fine violates the federal Excessive Fines Clause if it is "grossly disproportional to the gravity of a defendant's offense." *Bajakajian*, 542 U.S. at 334, 118 S. Ct. at 2036. The federal constitutional prohibition against excessive fines has been incorporated against the states within the Due Process Clause of the Fourteenth Amendment in the United States Supreme Court's *Timbs* decision. *Timbs v. Indiana*, 586 U.S. __, 139 S. Ct. 682, 686-87 (2019). In

examining the deeply rooted tradition behind the Excessive Fines Clause, the Supreme Court emphasized that an individual's ability to pay was historically an essential factor in determining a fine's excessiveness. *Timbs*, 139 S. Ct. at 687-89. Tracing this right back to the Magna Carta, the Supreme Court noted that economic punishment must "'be proportioned to the wrong' and 'not be so large as to deprive [an offender] of his livelihood.'" *Timbs*, 139 S. Ct. at 687-88 (internal citations omitted). This concept endured through Colonial-era creation of state constitutions and eventually the United States Constitution, but abuses continued in the form of excessive fines designed to "subjugate newly freed slaves and maintain the prewar racial hierarchy. . . . When newly freed slaves were unable to pay imposed fines, States often demanded involuntary labor instead." *Timbs*, 139 S. Ct. at 688-89.

¶49 The Excessive Fines Clause has provided "a constant shield throughout Anglo-American history" designed to protect other constitutional rights, guarding against the government's use of fines to chill the speech of political enemies, to coerce involuntary labor by imposing a penalty unpayable by the offender, and to generate government revenue from unjust punishments. *Timbs*, 139 S. Ct. at 689. This concept is reflected in other Supreme Court decisions requiring courts to conduct an ability-to-pay inquiry before revoking an offender's probation for failure to pay a fine, *Bearden v. Georgia*, 461 U.S. 660, 672, 103 S. Ct. 2064, 2072-73 (1983); before issuing a warrant for failure to pay, *Turner v. Rogers*, 564 U.S. 431, 449, 131 S. Ct. 2507, 2520 (2011); and before automatically suspending an offender's driver's license for failure to pay, *Bell v. Burson*, 402 U.S. 535, 539, 91 S. Ct. 1586, 1589 (1971); *cf. Mackey v. Montrym*, 443 U.S. 1, 13-17,

23

99 S. Ct. 2612, 2618-20 (1979) (upholding suspension of driver's license when procedural protections lowered risk of erroneous deprivation). Thus, analysis of proportionality extends not only to the fine's excessiveness in relation to the offense, but also the fine's excessiveness in relation to the offender and his ability to pay.[1]

¶50 Although federal law provides little other guidance in determining a fine's proportionality, the United States Supreme Court has emphasized the primacy of the legislature. *Solem v. Helm*, 463 U.S. 277, 290, 103 S. Ct. 3001, 3009 (1983) ("Reviewing courts . . . should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes . . . ."). Montana's constitution includes the right to be free from excessive fines among those enumerated in our Declaration of Rights, which are considered significant components of liberty and trigger the highest level of protection by the courts. Mont. Const. art. II, § 22 ("Excessive bail shall not be required, or excessive fines imposed, or cruel and unusual punishments inflicted."); *State v. Tapson*, 2001 MT 292, ¶ 15, 307 Mont. 428, 41 P.3d 305. Thus, the Montana Legislature has effectuated these federal and state constitutional protections against excessive fines by codifying the inquiry necessary to guarantee that a

---

[1] Other states have chosen to require an ability-to-pay inquiry in the analysis of a fine's excessiveness based on the Supreme Court's reasoning in *Timbs*, even without a clear legislative expression of proportionality like Montana's § 46-18-231(3), MCA. *See, e.g., Colo. Dep't of Lab. and Emp. v. Dami Hosp., LLC*, 2019 CO 47M, ¶¶ 30-31, 442 P.3d 94 (adopting an ability-to-pay element of proportionality review based on the Supreme Court's historical inquiry in *Timbs* and the concept of proportionality itself); *City of Seattle v. Long*, 493 P.3d 94, 113 (Wash. 2021) ("The weight of history and the reasoning of the Supreme Court demonstrate that excessiveness concerns more than just an offense itself; it also includes consideration of an offender's circumstances. The central tenet of the excessive fines clause is to protect individuals against fines so oppressive as to deprive them of their livelihood.").

fine is proportional in § 46-18-231, MCA. This statute evinces the Legislature's intention to include the offender's financial circumstances in the evaluation of a fine's proportionality, consistent with the Anglo-American history of the Excessive Fines Clause as a protection against fines imposed "without 'any Regard to the Nature of the Offences, or the Ability of the Persons.'" *Timbs*, 139 S. Ct. at 694, 203 L. Ed. 2d at 23, (Thomas, J., concurring) (citing Journals of the House of Commons 698 (Dec. 23, 1680)).

¶51 With these fundamental principles underlying § 46-18-231, MCA, noted, in addition to our observation of its plain language and text, we turn to the mandatory minimum fine the Legislature established in § 61-8-731(3), MCA (2019). Section 61-8-731(3), MCA (2019), requires that a fifth or subsequent DUI offender be sentenced to "a term of not less than 13 months or more than 5 years *or* be fined an amount of not less than $5,000 or more than $10,000, *or* both." (Emphasis added.)[2] Though in some cases a sentencing judge may choose to forego a fine in favor of incarceration under the disjunctive terms of the statute, in *all* instances where a fine is imposed, the statute requires imposition of the full amount

---

[2] It is worth noting that § 61-8-731(3), MCA (2019), which punishes a fifth or subsequent DUI offense, in allowing the sentencing court to choose between a supervisory sentence, or a $5,000 fine, or both, is *less* punitive than the punishment for a fourth or subsequent DUI in § 61-8-731(1), MCA (2019), which requires both a supervisory term *and* a minimum $5,000 fine. Accordingly, the Legislature amended the statute in 2021 to correct the discrepancy, making the punishment for fourth and fifth or subsequent conviction both incarceration and a fine. Section 61-8-1008(2), MCA (2021) (A person convicted of DUI who has four or more prior convictions "shall be punished by a fine of not less than $5,000 or more than $10,000, *and* by imprisonment in the state prison for a term of not more than 10 years.") (Emphasis added); § 61-8-1008(3), MCA (2021); Hearing on HB 115 before the Senate Judiciary Committee, 67th Legislature, 09:12:10 - 09:12:32 (Mar. 11, 2021) (testimony of proponent Cory Swanson, Montana County Attorneys' Association) ("Not only is it ironic that under current law, your sentence for a tenth DUI is the same as your sentence for a fifth DUI, but, under current law, a sentence for five through ten is actually less serious than your sentence for fourth DUI.").

25

of the fine; that is, a judge cannot weigh the statutorily required proportionality factors and must impose the full $5,000 fine every time a fine is imposed. Here, the problem is in the mandatory nature of the minimum fine contained in § 61-8-731(3), MCA (2019), and the inability of a sentencing court to consider other sentencing statutes prescribed by the Legislature that codify constitutional proportionality principles.

¶52 Mandatory minimum sentencing laws eliminate judicial discretion to impose sentences below the statutory minimum. In his Dissent, ¶ 76, Justice Shea faults the Court for "not attempt[ing] to harmonize the provisions of § 46-18-231, MCA, with § 61-8-731, MCA, to give effect to each statute . . . ." Justice Shea would "harmonize" the statutes by writing in a penalty that the legislature did not provide. Section 61-8-731, MCA, provides a "mandatory minimum," thus denoting that the fine is both "mandatory" and a "minimum." However, it was the Legislature's purpose and intent to *remove judicial discretion* and require imposition of a minimum $5,000 fine. And it is only the Legislature that has the authority to determine the offense and the penalty. As early as 1893, this Court recognized the role of the Legislature in defining a crime and establishing its penalty.

> It is the legislature, not the court, which is to define a crime, and ordain its punishment. It is said that, notwithstanding this rule, the intention of the lawmaker must govern in the construction of penal as well as other statutes. This is true. But this is not a new independent rule, which subverts the old. It is a modification of the ancient maxim, and amounts to this: that, though penal laws are to be construed strictly, they are not to be construed so strictly as to defeat the obvious intention of the legislature. The maxim is not to be so applied as to narrow the words of the statute to the exclusion of cases which those words, in their ordinary acceptation, or in that sense in which the legislature has obviously used them, would comprehend. The intention of the legislature is to be collected from the words they employ. Where there is no ambiguity in the words, there is no room for construction.

26

*State v. Hayes*, 13 Mont. 116, 120 (1893). Hence, "[t]he sentencing authority of a court exists solely by virtue of a statutory grant of power and therefore cannot be exercised in any manner not specifically authorized." *State v. Lenihan*, 184 Mont. 338, 342, 602 P.2d 997, 1000 (1979).

¶53 Justice Shea would fashion his own penalty that authorizes a court to impose a fine in an amount less than what the Legislature clearly intended and mandated. In the construction of a statute, however, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted. Section 1-2-101, MCA. Justice Shea's "harmonizing" of a statute that removes judicial discretion with a statute that requires judicial discretion leads to the Dissent's untenable result of altering a legislatively mandated penalty. This Court is without the authority to establish an offense and set its penalty, and we may not rewrite a statute to "harmonize" it with another to avoid a constitutional analysis. Our role is limited to determining whether the legislatively mandated fine is constitutional.

¶54 Mandatory minimum fines can produce punishment that is disproportionate and unjust when the offender's ability to pay is not considered. Justices Rice and Baker, in their Dissent, maintain that the imposition of fines on persons lacking financial resources to pay them nonetheless conceivably advances public safety. They assume that the Legislature, when establishing a mandatory minimum fine, intended to forgo ability to pay considerations that it prescribed in § 46-18-231, MCA. Rice & Baker, JJ., Dissent, ¶¶ 85-86. However, § 46-18-231, MCA, initially enacted in 1981, is an enlightened response to the increasing punitiveness in the American approach to criminal justice, an

27

acknowledgment that imposition of mandatory fines on impoverished defendants are unlikely to reduce future crime, and a recognition that the impact of mandatory minimum fines is disproportionate on families of poor defendants and minority communities, particularly those of color.

¶55 A poor offender feels the impact of any fine disproportionately compared to his wealthier counterpart. An indigent defendant who remains criminally obligated to pay the same fine, *but cannot pay it*, risks getting caught in an endless cycle of escalating debt, incarceration, and longer periods of entanglement with the justice system. Mandatory minimum fines thus disproportionately impact minority communities and people of color. Moreover, the collateral consequences of imposing disproportionate fines on an offender's family, who often pay their loved one's financial obligation, ensures that the reach of the criminal justice system and its punishment extends beyond the offender. Oftentimes, the symbiotic harm from mandatory minimum fines affects the women in an offender's family—the mother, wife, or sister pays the fine for their loved one and there is less money for food, clothing, and shelter. An indigent defendant must continue to worry about a revocation, incarceration, and a longer period of involvement with the justice system if he has no resources to pay the fine. A mandatory minimum penalty transfers sentencing discretion, like that embodied in § 46-18-231, MCA, from the judge and *requires* a particular sentence be imposed. A sentencing judge cannot consider when imposing a mandatory fine whether a defendant will be able to pay for necessities, adequately feed and take care of children and other family obligations, purchase necessary medication, maintain housing, and the like. Here, Gibbons is 77 years old, homeless, in poor health,

28

unemployed, receiving $1,300 in social security, and is $9,000 in debt. The District Court could not consider Gibbons's circumstances because it recognized it was mandated to impose a minimum $5,000 fine.

¶56 When the public expresses fear of victimization and a belief that criminals are not receiving a harsh enough punishment, there is a tendency to respond in kind with new crimes and stiffer penalties, including increasing mandatory minimum fines. See Rice & Baker, JJ., Dissent, ¶ 84. The enactment of a mandatory minimum penalty does not involve "any careful consideration" of the ultimate effects, Chief Justice Rehnquist once noted. William H. Rehnquist, *Luncheon Address (June 18, 1993)*, in U.S. Sent'g Comm'n, Drugs and Violence in America 283, 287 (1993). By their very nature, a mandatory minimum allows no discretion for the sentencing judge to impose anything but the mandatory fine. This is in direct opposition to the requirements of § 46-18-231, MCA, which codifies that the proportionality analysis required by the Montana and federal constitutions must include—not only a proportionality to the offense which the Legislature has determined when establishing the penalty for an offense—a proportionality *to the offender* as well. Thus, Montana's legislature had the foresight to impose a statutory *offender* proportionality analysis. Contrary to Justices Rice & Baker's assertion in their Dissent, ¶ 85, this Court does not need to rely on *Timbs* to require an inquiry into a defendant's resources and ability to pay because the Legislature itself has determined that before imposing a fine, the inquiry must include a proportionality consideration of the offenders' ability to pay. Accordingly, § 61-8-731(3), MCA, (requiring a mandatory minimum fine) is irreconcilable with § 46-18-231, MCA, (requiring the sentencing judge consider the offender's ability to pay).

29

This is true particularly because the purpose of the Legislature in enacting a statute with a mandatory minimum fine is to remove sentencing discretion from the judge.[3]  Moreover, in contrast to § 61-8-731(3), MCA, only § 46-18-231, MCA, is tethered to an important fundamental right grounded in the Excessive Fines Clauses of the Montana and federal constitutions.  We therefore must consider whether § 61-8-731(3), MCA, can be applied consistent with the constitution and the purpose underlying § 46-18-231, MCA.

¶57    We do not have to plow new territory to resolve the issue raised.  Our decision and reasoning in *State v. Yang*, 2019 MT 266, 397 Mont. 486, 452 P.3d 897, is persuasive. Justices Rice and Baker emphasize in their Dissent, ¶ 83, that the Court in *Yang* contrasted § 61-8-731(3), MCA, to the market fine statute at issue in *Yang*, thus suggesting that *Yang* is not persuasive.  In *Yang*, the statute at issue, § 45-9-130(1), MCA, had no limit on the mandatory 35%-market-value fine that must be imposed, and we noted its distinction from other statutes which provided a range for fines that included a mandatory minimum.  *Yang*, ¶ 23.  In *Yang*, we did not address a mandatory *minimum* fine statute as here; rather we simply noted the distinction and did not address constitutional proportionality requirements of mandatory minimum fines.  Our distinction recognized the Legislature's authority to prescribe sentences and establish penalties, and that a mandatory minimum fine was different from the statute at issue in *Yang*.  *Yang* articulated the principle, in the context of

---

[3] As an example of how §§ 46-18-231 and 61-8-731, MCA, could operate inconsistently, suppose an ability to pay analysis resulted in a court determining that a defendant could not afford $5,000, but could afford, for example, $300.  Under such a scenario, no fine at all could be imposed because $300 is not authorized by statute, even though the clear purpose and intent of the legislature under § 61-8-731, MCA, was to impose an enhanced financial penalty for felony DUIs.

30

the statute there at issue, that a sentencing judge may not be prevented from considering an offender's ability to pay a fine without offending constitutional proportionality considerations and § 46-18-231, MCA. The question of whether the statute here at issue, requiring a mandatory *minimum*, is facially unconstitutional given Montana's statutory and constitutional protections against the imposition of disproportionate fines was not before the Court in *Yang,* where there was no mandatory minimum fine. We contrasted the statute in *Yang* to the statute here only to clarify that we were not opining as to the constitutionality of mandatory *minimum* fines. Here, the issue pertains to a statute that contains both a mandatory minimum and maximum. While much of our reasoning in *Yang* controls here, Justices Rice and Baker's Dissent, ¶¶ 82-83, is misguided when it concludes that an observation made by the Court in *Yang* as to mandatory minimum fines is controlling here.

¶58     In *Yang,* Yang argued the mandatory requirement that a 35%-market-fine be imposed in every drug possession conviction—without consideration of an offender's resources, the nature of the crime committed, and the burden the required fine would have on the offender—violated Yang's constitutional right against excessive fines. *Yang*, ¶ 9. We held that when a sentencing statute containing a mandatory fine requirement prevents the trial court from considering proportionality factors before imposing a fine, the statute is facially unconstitutional. *Yang*, ¶¶ 18-19, 28. We made the following observations about the 35%-market-value fine at issue in *Yang*, which also aptly describe the mandatory minimum fine at issue here:

> The statute's 'shall' language makes the fine non-discretionary—a court *must* impose the fine upon a person found to have possessed or stored dangerous drugs. [The 35% market-value fine] removes any ability of the

31

trial court, through its mandatory nature, of protecting against an excessive fine. Accordingly, it is inconsequential that in *some* situations—following consideration of the nature of the crime committed, the financial resources of the offender, and the nature of the burden of payment of the fine— imposition of the 35%-market-value fine is not excessive. What is consequential, however, and which occurs in *every* case as a result of the mandatory nature of the fine, is the inability of the trial court to even consider whether the fine is excessive. Here, the important distinction is that in *all* situations a trial court is precluded from considering the factors the Montana legislature has expressly mandated be considered when it enacted § 46-18-231(3), MCA, to ensure that fines are not excessive as guaranteed in both the United States Constitution and Montana's Constitution.

*Yang*, ¶ 18 (emphasis in original).

¶59 In *Yang* we explained that a facial constitutional challenge arises when the *statute* upon which the district court based the penalty, in all cases, imposes an unconstitutional sentence. An as-applied constitutional challenge alleges that the particular *sentence* imposed upon the defendant is illegal but concedes that the sentencing statute is constitutional. *Yang*, ¶ 11. In *Yang*, we determined that the sentencing statute was facially unconstitutional when it assessed a mandatory fine at 35% of the market value of the drugs in every case and when the mandatory nature of the fine did not permit the sentencing judge from considering proportionality factors. *Yang*, ¶ 18. Yang's appeal challenged the sentencing *statute*, even though in *some* cases the 35%-market-value fine might be considered proportional, because "in *all* situations a trial court is precluded from considering the factors the Montana legislature has expressly mandated be considered . . . to ensure that fines are not excessive . . . ." *Yang*, ¶ 18 (emphasis in original). This Court explained:

[The 35% market-value fine] is facially unconstitutional to the extent it requires a sentencing judge to impose a mandatory fine without ever

32

> permitting the judge to consider whether the fine is excessive. No set of circumstances exist under which [the mandatory fine statute] is valid—the statute is unconstitutional in all of its applications because it completely prohibits a district court from considering whether the 35%-market-value fine is grossly disproportionate to the offense committed.

*Yang*, ¶ 23.

¶60 Here, Gibbons challenges the constitutionality of the *statute*, not his particular sentence under an otherwise constitutional statute. Gibbons challenges the mandatory fine that must be imposed without consideration of proportionality factors, just as Yang did. Our analysis and holding in *Yang* are conclusive. Thus, like *Yang's* 35%-market-value fine, the mandatory minimum $5,000 fine required by the sentencing statute, every time it is imposed, prevents a judge from considering constitutional and statutorily mandated factors and is, therefore, facially unconstitutional.

¶61 The State attempts to rephrase Gibbons's argument as a question of statutory interpretation and argues that because the statute allowed the sentencing court to impose a prison sentence rather than a fine, the challenge is as-applied and thus not subject to review. However, under the challenged statute, a sentencing court must impose at least a $5,000 fine, or it may impose a prison sentence with no fine at all. When it does impose a fine, it cannot inquire as to the defendant's ability to pay before doing so, bypassing the constitutional cornerstone of proportionality. Furthermore, if the sentencing court were to conduct an ability-to-pay inquiry, find that an offender is indigent, and thus choose not to impose any fine under the disjunctive "or" language of § 61-8-731(3), MCA, the sentencing court would then be *required* to impose a period of incarceration instead. Far from remedying the constitutional deficiency, as the State argues, this application of the

33

ability-to-pay inquiry runs afoul of the basic prohibition against incarcerating an offender solely for his poverty. *Bearden*, 461 U.S. at 671, 103 S. Ct. at 2072; *Tate v. Short*, 401 U.S. 395, 397-98, 91 S. Ct. 668, 670-71 (1971). In contrast to *Tate*, which held unconstitutional the automatic conversion of a *fine-only* offense to a prison sentence for indigent defendants, we do not opine on whether § 61-8-731(3) presents the same constitutional defect. We merely point out that the statute's disjunctive language allowing the sentencing court to forego a fine and instead impose a penalty of incarceration is not the constitutional equivalent of a proportionality inquiry, nor does it convert Gibbons's argument to an as-applied challenge or question of statutory interpretation.

¶62 Stare decisis is an important policy and plays a significant role in our case law. It protects those who have taken action in reliance on a past decision and reduces the incentive for challenging existing precedent, thus saving parties and courts the time and expense of endless litigation. It fosters reliance on judicial decisions and contributes to the actual and perceived integrity of the judicial process. *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S. Ct. 2597, 2609 (1991). Adhering to precedent "is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than that it be settled right." *Burnet v. Coronado Oil & Gas Co.*, 285 U.S. 393, 406, 52 S. Ct. 443, 447 (1932) (Brandeis, J., dissenting). However, it has long been recognized that stare decisis is not an inexorable command; rather, it "is a principle of policy and not a mechanical formula of adherence to the latest decision . . . ," *Helvering v. Hallock*, 309 U.S. 106, 119, 60 S. Ct. 444, 451 (1940), and it is "weakest when we interpret the Constitution . . . ." *Agostini v. Felton*, 521 U.S. 203, 235, 117 S. Ct. 1997, 2016 (1997).

When it comes to interpretation of our Constitution, we place a high value on getting it right, because citizens must live with a bad decision unless we correct our mistake. *Kimble v. Marvel Entm't, LLC*, 576 U.S. 446, 456, 135 S. Ct. 2401, 2409 (2015). Thus, when governing decisions are badly reasoned or insufficiently reasoned, we are not constrained to follow precedent.

¶63     In *State v. Mingus*, 2004 MT 24, 319 Mont. 349, 84 P.3d 658, this Court, addressing the interplay between § 61-8-731, MCA, and § 46-18-231, MCA, summarily concluded in a single paragraph that "[w]hen a fine is statutorily mandated, the court has no discretion as to whether to impose the fine, irrespective of the defendant's ability to pay." *Mingus*, ¶ 15. In *Mingus*, this Court did not consider the *constitutional* implications of imposing a fine upon a defendant who lacked the financial resources and ability to pay the fine. Over the past twenty years, *Mingus* was not challenged (under the policy of stare decisis) until recently after this Court's precedent began to evolve. Here, for the first time, we have been presented with the question of whether a mandatory fine violates constitutional proportionality requirements embedded in the prohibition against excessive fines and fees of the United States Constitution, the Montana Constitution, and in Montana statutes implemented to protect against such a constitutional violation. It is plain that if we place emphasis on the orderly administration of justice rather than on a blind adherence to unreasoned precedent, *Mingus* must be overruled. It is true that Montana defendants who are poor, as well as their families who often bear the burden of their loved one's financial obligations, have paid a disproportionate penalty in comparison to their wealthier counterparts for the past two decades. That is, however, no justification for this Court to

continue to allow impoverished persons in our justice system to be disproportionately impacted in violation of their constitutional rights. No interest could be furthered by such a rigid application of stare decisis, nor such an interest superior to a system of justice based on considered application of our constitution.

¶64 "Article II, Section 22, of the Montana Constitution requires that the sentencing judge be able to consider 'the nature of the crime committed, the financial resources of the offender, and the nature of the burden that payment of the fine will impose' before ordering the offender to pay [a statutorily mandated fine]." *Yang*, ¶ 24 (quoting § 46-18-231(3), MCA). Because, in every case, a sentencing judge imposing *any* fine under § 61-8-731(3), MCA, cannot consider these factors before doing so, we hold that the statute is facially unconstitutional and violated Gibbons's right to be free from excessive fines. *Mingus* is clearly inconsistent with constitutional proportionality requirements and the requirement in § 46-18-231, MCA, that the offender's resources and the nature of the burden created by the fine be considered prior to imposition of a fine—a requirement we have concluded is rooted in the Excessive Fines and Fees Clauses of the Montana and federal constitutions. Accordingly, we overrule *Mingus* to the extent it prevents a court from considering an offender's ability to pay prior to imposing any fine.

## CONCLUSION

¶65 The jury instructions provided by the District Court fully and fairly instructed the jury as to the applicable law of the case. Furthermore, the District Court did not abuse its discretion when it allowed the State to rebut the defense's closing argument that the State acted dishonestly when it decided not to introduce photographic evidence.

36

¶66    Section 61-8-731(3), MCA, is facially unconstitutional to the extent that whenever the sentencing judge imposes a fine, the statute does not allow the judge to consider, before imposing the $5,000 mandatory minimum, the proportionality factors protecting an offender from excessive fines.

¶67    Affirmed in part, reversed in part, and remanded for further proceedings.

/S/ LAURIE McKINNON

We Concur:

/S/ MIKE McGRATH
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR

Justice James Jeremiah Shea, concurring in part and dissenting in part.

¶68    I concur with the Court's resolution of Issues One and Two. I also agree with the Court's conclusion that a plain language reading of § 46-18-231, MCA, requires that a sentencing judge may only impose a fine when the offender is able to pay, that it requires the sentencing judge to consider the offender's resources and the nature of the burden payment of the fine will impose, and that § 46-18-231, MCA, unambiguously applies to all convictions where a fine may be imposed, without exception for statutes that include a mandatory minimum fine. Opinion, ¶ 45. But because § 46-18-231, MCA, *statutorily* requires a sentencing judge to consider a defendant's ability to pay before imposing any fine—irrespective of whether or not the fine is mandatory—I would decline to address Gibbons's constitutional challenge. We have repeatedly held that "courts should avoid

37

constitutional issues whenever possible." *State v. Russell*, 2008 MT 417, ¶ 19, 347 Mont. 301, 198 P.3d 271 (quoting *In re S.H.*, 2003 MT 366, ¶ 18, 319 Mont. 90, 86 P.3d 1027). Since this issue can be resolved by applying the mandatory plain language of § 46-18-231, MCA, consistently with the mandatory plain language of § 61-8-731(3), MCA, it can, and should, be decided by harmonizing both statutes, as we are required to do, without resorting to consideration of Gibbons's constitutional challenge.

¶69    I submit that both the Court's holding and Justice Rice's dissent suffer from the same statutory misconstruction, while ironically reaching opposite conclusions. The Court abrogates the mandatory fine provision of § 61-8-731(3), MCA, by holding it to be facially unconstitutional in violation of the excessive fines provisions of the U.S. and Montana Constitutions, as codified by § 46-18-231(3), MCA. Conversely, Justice Rice would abrogate the mandatory proportionality considerations of § 46-18-231(3), MCA, by holding it is trumped by § 61-8-731(3), MCA.

¶70    "[T]he rules of statutory construction require us to reconcile statutes if it is possible to do so in a manner consistent with legislative intent." *Ross v. City of Great Falls*, 1998 MT 276, ¶ 19, 291 Mont. 377, 967 P.2d 1103. While it is true that "where a specific statute conflicts with a general statute, the specific controls over the general to the extent of any inconsistency," *Gallatin Saddle & Harness Club v. White*, 246 Mont. 273, 276, 805 P.2d 1299, 1301 (1990), "this Court must harmonize statutes relating to the same subject, as much as possible, giving effect to each." *Oster v. Valley County*, 2006 MT 180, ¶ 17, 333 Mont. 76, 140 P.3d 1079 (citation omitted). Neither the Court, nor Justice Rice, attempt to harmonize these two mandatory statutes. Instead, both jump to the conclusion that they

38

cannot be harmonized, with the result being the Court's nullification of the mandatory fine in § 61-8-731(3), MCA, and Justice Rice's nullification of the mandatory provisions of § 46-18-231(3), MCA, as it pertains to statutes that include mandatory fines, notwithstanding the absence of any language that would exclude those statutes from its mandatory provisions.

¶71 Beginning with the Court's analysis, it correctly notes that § 46-18-231, MCA, "clearly and plainly requires" that "whenever" an offender has been found guilty of a felony or misdemeanor, the sentencing court may "only" impose a fine when the offender is able to pay, and "shall" consider the offender's resources and the nature of the burden payment of the fine will impose. Opinion, ¶ 45. The Court correctly notes that "§ 46-18-231, MCA, applies to all convictions where a fine may be imposed and makes no exceptions for statutes that establish a minimum mandatory fine." Opinion, ¶ 45. Finally, the Court correctly notes that by enacting § 46-18-231, MCA, "the Montana Legislature has effectuated [the] federal and state constitutional protections against excessive fines by codifying the inquiry necessary to guarantee that a fine is proportional," and that the "statute evinces the Legislature's intention to include the offender's financial circumstances in the evaluation of a fine's proportionality . . . ." Opinion, ¶ 50.

¶72 Where the Court's analysis goes awry is that after correctly concluding that the plain language of § 46-18-231, MCA, "makes no exceptions for statutes that establish a minimum mandatory fine," Opinion, ¶ 45, the Court concludes that "the problem [with] the mandatory nature of the minimum fine contained in § 61-8-731(3), MCA (2019), [is] the inability of a sentencing court to consider other sentencing statutes prescribed by the

39

Legislature that codify constitutional proportionality principles." Opinion, ¶ 51. But that problem is remedied by harmonizing § 61-8-731(3), MCA, with § 46-18-231, MCA, giving effect to each statute. *Oster*, ¶ 17 (citation omitted).

¶73 Section 61-8-731(3), MCA, provides a sentencing range for a fifth or subsequent DUI conviction that includes a mandatory minimum fine, should the sentencing court choose to impose one. But § 46-18-231(3), MCA, also applies to fines imposed for all felonies and misdemeanors, including fifth offense DUIs, and it requires that the sentencing court "may not sentence an offender to pay a fine unless the offender is or will be able to pay the fine and interest[,]" and that "the sentencing judge shall take into account the nature of the crime committed, the financial resources of the offender, and the nature of the burden that payment of the fine and interest will impose." Harmonizing these two statutes as much as possible in an effort to give effect to each of them, as we are constrained to do, leads to the following process at sentencing: as required by § 46-18-231(3), MCA, the sentencing court "*shall* take into account the nature of the crime committed, the financial resources of the offender, and the nature of the burden that payment of the fine and interest will impose." Within the context of that mandatory assessment, the sentencing court shall consider whether the defendant is financially able to pay the minimum fine prescribed by § 61-8-731(3), MCA. If the defendant is financially able to pay the mandatory minimum fine, then § 61-8-731(3), MCA, requires the sentencing court to impose a fine within the range prescribed by the statute. However, if the sentencing court determines that the defendant is unable to pay the mandatory minimum fine, then § 46-18-231(3), MCA,

40

allows the sentencing court to impose a fine only to the extent the defendant "is or will be able to pay the fine."

¶74 While I agree with Justice Rice's rejection of Gibbons's constitutional challenge to § 61-8-731(3), MCA, I disagree with his analysis that would vitiate the mandatory provisions of § 46-18-231(3), MCA, as it pertains to mandatory fines. Although noting that both statutes are of equal dignity, Justice Rice would elevate the provisions of § 61-8-731(3), MCA, over the provisions of § 46-18-231(3), MCA, because § 61-8-731(3), MCA, is specific to DUI offenses, whereas § 46-18-231(3), MCA, applies to all crimes. Rice Dissent, ¶ 86. Justice Rice correctly notes that a specific statute will control over the provisions of an inconsistent general statute, but that does not preclude our obligation to harmonize statutes relating to the same subject matter, as much as possible, to give effect to each. *Oster* ¶ 17 (citation omitted). Because it is possible to harmonize the two statutes in this case, I would not invalidate the mandatory provisions of § 46-18-231(3), MCA, as they pertain to minimum fines.[1]

¶75 In harmonizing these statutes, it is necessary to address this Court's holding in *Mingus*. Both Gibbons and the State discuss *Mingus* at length in their briefs within the context of Gibbons's constitutional challenge. Gibbons argues that our holding in *Mingus*,

---

[1] Justice Rice acknowledges in his dissent on this issue that there could be cases where the imposition of a fine within a mandatory statutory range may be excessive as applied to a particular defendant, which could provide the basis for an as-applied constitutional challenge during sentencing. Rice Dissent, ¶ 88. The application of the mandatory proportionality considerations of § 46-18-231, MCA, would likely obviate the need for even an as-applied constitutional challenge.

as it pertains to the application of § 46-18-231, MCA, to statutorily mandated fines is manifestly wrong. The State disagrees.

¶76 In *Mingus*, the defendant argued that the District Court erred by not inquiring into his ability to pay, as required by § 46-18-231, MCA, before imposing a mandatory minimum fine pursuant to § 61-8-731, MCA. *Mingus*, ¶ 12. This Court rejected Mingus's argument. After noting that § 46-18-231(3), MCA, provides that a "sentencing judge may not sentence an offender to pay a fine unless the offender is or will be able to pay the fine," and that "[i]n determining the amount and method of payment, the sentencing judge shall take into account the nature of the crime committed, the financial resources of the offender, and the nature of the burden that payment of the fine will impose," we summarily held: "This statutory provision does not apply to mandatory fines. When a fine is statutorily mandated, the court has no discretion as to whether to impose the fine, irrespective of the defendant's ability to pay." *Mingus*, ¶ 15. In arriving at this summary holding, we did not attempt to harmonize the provisions of § 46-18-231, MCA, with § 61-8-731, MCA, to give effect to each statute, consistent with legislative intent, nor did we offer any explanation as to how and why, despite the plain language of § 46-18-231, MCA, applying to *all* felonies and misdemeanors, without exception, we inserted an exception for mandatory fines.

¶77 In the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted. Section 1-2-101, MCA. In *Mingus*, this Court inserted an exception for mandatory fines into § 46-18-231, MCA. In doing so, we abrogated the mandatory provisions of § 46-18-231, MCA. Because these statutes can be

42

reconciled, I would hold *Mingus* is manifestly wrong. In that regard, rather than providing a basis to find the mandatory fine in § 61-8-731, MCA, unconstitutional, as Gibbons argues, I would hold that the statute is constitutional in this case precisely because the Legislature has provided a *statutory* method for a sentencing court to consider a defendant's ability to pay and to ensure that the fine is proportional.

¶78    When interpreting a statute, "it is the duty of this Court to avoid an unconstitutional interpretation if possible." *Brown v. Gianforte*, 2021 MT 149, ¶ 32, 404 Mont. 269, 488 P.3d 548 (quoting *Hernandez v. Bd. of Cty. Comm'rs*, 2008 MT 251, ¶ 15, 345 Mont. 1, 189 P.3d 638). When read in conjunction with the mandatory proportionality considerations of § 46-18-231(3), MCA, § 61-8-731, MCA, can be interpreted constitutionally. Following our directive to "avoid constitutional issues whenever possible," *Russell*, ¶ 19, I would decide this issue on that basis and decline to consider Gibbons's constitutional challenge to § 61-8-731, MCA. Accordingly, I would remand this matter to the District Court for a determination of Gibbons's ability to pay pursuant to § 46-18-231, MCA. Contingent upon that determination, I would instruct the District Court to impose a fine pursuant to the provisions of § 61-8-731, MCA.

/S/ JAMES JEREMIAH SHEA

Justice Jim Rice, concurring in part and dissenting in part.

¶79    Regarding Issue 3, the Court overturns 20 years of precedent that distinguished mandatory statutory fines from discretionary fines in order to assign a new interpretation to § 61-8-731(3), MCA (2019), so that it may strike down the new interpretation as

43

unconstitutional. I would not do any of those things. Further, in my view, the authorities cited by the Court do not support its determination that § 61-8-731(3), MCA (2019), a statute utilized for 27 years, is facially invalid under either the U.S. or Montana Constitutions. I do not believe the Court is here compelled to exercise the power of judicial review to declare the statute unconstitutional, and thus, I would refrain from doing so. I therefore dissent from Issue 3. I concur in the other issues.

¶80 "A statute is presumptively constitutional . . . . The question of constitutionality is not whether it is possible to condemn, but whether it is possible to uphold the legislative action." *Duane C. Kohoutek, Inc. v. State*, 2018 MT 123, ¶ 14, 391 Mont. 345, 417 P.3d 1105 (internal citations omitted). The necessity for these parameters governing the exercise of judicial review by the judiciary, which must "incontestably" be "beyond comparison the weakest of the three departments of power," *The Federalist* No. 78, 496 (Robert Scigliano ed., Random House, Inc. 2000), merits a fuller discussion on another day, but the many expressed reasons include that judicial review can have a "tendency over time seriously to weaken the democratic process." Alexander M. Bickel, *The Least Dangerous Branch* 21 (1962). This is because:

> the exercise of [the power of judicial review], even when unavoidable, is always attended with a serious evil, namely, that the correction of legislative mistakes comes from the outside, and the people thus lose the political experience, and the moral education and stimulus that comes from fighting the question out in the ordinary way, and correcting their own errors. The tendency of a common and easy resort to this great function, now lamentably too common, is to dwarf the political capacity of the people, and to deaden its sense of moral responsibility.

*Plyler v. Doe*, 457 U.S. 202, 253, n.15, 102 S. Ct. 2382 (1982) (Burger, C.J., O'Connor, White, Rehnquist, JJ., dissenting) (bracketing in original) (internal quotations omitted) (quoting James B. Thayer, *John Marshall*, 106-07 (1901)).

¶81    In order to prevail on a facial constitutional challenge to a statute, a plaintiff is burdened with demonstrating that "no set of circumstances exists under which the [challenged sections] would be valid, i.e., that the law is unconstitutional in all of its applications." *Mont. Cannabis Indus. Ass'n v. State*, 2016 MT 44, ¶ 14, 382 Mont. 256, 368 P.3d 1131 (brackets in original) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449, 128 S. Ct. 1184, 1190 (2008)).  The Court professes adherence to these principles and, therefore, upon their application, I would conclude it is possible in this case to uphold § 61-8-731(3), MCA (2019), against a facial constitutional challenge, and would affirm.

¶82    The Court holds that § 61-8-731(3), MCA (2019),[1] violates Section 22 of the Montana Constitution.  Opinion, ¶ 60.  The Court reasons that because § 61-8-731(3), MCA (2019), imposes a "mandatory" fine, the statute is facially unconstitutional because it does not set forth an express mechanism for consideration of a defendant's financial circumstances.  The Court's decision thus goes beyond the holding in *Yang* and effectively declares that any fine, even within a given range, is facially unconstitutional if it does not contain such an express mechanism.  In my view, the extent of the Court's holding is not

---

[1] Section 61-8-731(3), MCA (2019), applied in this case, was repealed effective January 1, 2022, as part of a general revision to the DUI statutes. *See* 2021 Mont. Laws ch. 498, § 44.  The content was recodified at § 61-8-1008 (3), MCA (2021).

supported by the federal and state authorities cited by the Court and is unnecessarily overbroad.

¶83    First, § 61-8-731(3), MCA (2019), is significantly different than § 45-9-130(1), MCA, the statute invalidated in *Yang*. Section 45-9-130(1), MCA, imposed a fine based upon a percentage, that being 35%, of the fair market value of drugs illegally possessed by the convicted defendant. *Yang*, ¶ 9. The Court faulted § 45-9-130(1), MCA, for having "no [upper] limit," which would leave a sentencing judge unable to cap the fine. *Yang*, ¶ 23. In doing so, the Court contrasted the statute there with § 61-8-731(3), MCA (2019)— the very statute before the Court today:

> [Section] 45-9-130(1), MCA, mandates a sentencing judge to fine an offender 35% of the drugs' fair market value, thus not permitting the judge to take any additional circumstances into account when sentencing an offender. *Unlike other mandatory fines which are "provided by [the] law for the offense," § 46-18-201(3)(a), MCA, such as the minimum fine of $5,000 and the maximum fine of $10,000 for driving under the influence of alcohol or drugs, § 61-8-731(1)(a)(iii), (b)(ii), MCA*, there is no limit on the mandatory 35%-market-value fine.

*Yang*, ¶ 23 (emphasis added). The Court's reasoning on this point is thus inconsistent with *Yang*.

¶84    Despite the reasoning employed in *Yang*, the Court concludes that § 61-8-731(3), MCA (2019), is unconstitutional as well. Since its enactment in 1997, § 61-8-731(3), MCA (2019), has provided not only an upper limit but also a range for fine amounts, and thus grants discretion to sentencing judges to determine what the fine should be within this range, currently between a minimum of $5,000 and a maximum of $10,000. The original fine range, adopted in 1997, was $1,000 to $10,000 and, notably, the upper limit has not

been increased over that time. *See* § 61-8-731(1)(c), MCA (1997). The Legislature's provision of a monetary range in contrast to a singular mandatory amount is inherent authority for a judge to consider the circumstances of the offense and the financial resources of the defendant when imposing the fine, reflecting proportionality. The Court acknowledges, in theory, that the principle of proportionality is the touchstone of a court's consideration of the Excessive Fine Clause, Opinion, ¶ 48, and that fines are not to be "grossly disproportional to the gravity of a defendant's offense." *Bajakajian*, 542 U.S. at 334, 118 S. Ct. at 2036. But this critical principle seems to be lost in the Court's final analysis, which reflects no acknowledgment that the statutory fine range challenged here is applicable to offenders who have, by their actions, caused profound danger for other drivers, pedestrians, and society at large—their *fifth or subsequent* DUI. The safety of the public is thus at stake, making the "gravity of [the] defendant's offense" significantly high. *Bajakajian*, 542 U.S. at 334, 118 S. Ct. at 2036. It is very appropriate in this circumstance that the Legislature would calibrate attendant penalties to deter and punish such dangerous behaviors, particularly when Montana leads the nation in percentage of fatal accidents caused by drunk driving, *see* NHTSA, *2021 Traffic Safety Facts: Alcohol-Impaired Driving* (June 2023), https://perma.cc/C2JC-UJFF. Other state legislatures have imposed similar fines. *See, e.g.,* 75 Pa. Cons. Stat. § 3804(a)(3) (imposing a mandatory minimum of $500 and maximum of $5,000 for third or subsequent DUI offense); R.I. Gen. Laws § 31-27-2(d)(2)(i) (imposing a mandatory fine for a second DUI in a five-year period); 625 Ill. Comp. Stat. 5/11-501(d)(2)(B) (imposing a mandatory fine for third time offenders of aggravated DUI).

¶85    The Court leans heavily on the Supreme Court's ruling in *Timbs v. Indiana* to reason that a statute is unconstitutional under the Eighth Amendment if it lacks an express mechanism to inquire into a defendant's financial resources.  Opinion, ¶¶ 48-50.  I disagree with this assessment of *Timbs*.  There, the Supreme Court's holding simply applied the Eighth Amendment's Excessive Fines Clause to the states via the Fourteenth Amendment. *Timbs*, 139 S. Ct. at 686-87.  While the *Timbs* Court indeed recognized that protections against excessive fines were deeply rooted in this nation's history and traditions, about that point there is no dispute.  *See Timbs*, 139 S. Ct. at 691 (Gorsuch, J., concurring) (noting there is "no serious doubt that the Fourteenth Amendment requires the States to respect the freedom from excessive fines enshrined in the Eighth Amendment.").  But the Court here further maintains that the *Timbs* Court also "emphasized that an individual's ability to pay was historically an essential factor in determining a fine's excessiveness," Opinion, ¶ 48, an assertion that is overstated; the quote the Court here cites from Blackstone, 4 W. Blackstone, *Commentaries on the Laws of England* 372 (1769), that "no man shall have a larger amercement imposed upon him than his circumstances or personal estate will bear . . . . ," was actually made by the *Timbs* Court to support its position that "economic sanctions be *proportioned* to the wrong."  *Timbs*, 139 S. Ct. at 688 (emphasis added).  Far from "emphasiz[ing]" that the ability-to-pay analysis "was historically an essential factor," Opinion, ¶ 48, the *Timbs* Court's citation to Blackstone was followed by an explanation that its own precedent had never found that a person's income or wealth were relevant considerations in judging the excessiveness of a fine.  *See Timbs*, 139 S. Ct. at 688 (citing *Bajakajian*, 524 U.S. at 340, n.15, 118 S. Ct. at 2028).  This remains the general law today,

before and after *Timbs*. *See, e.g., United States v. Beecroft*, 825 F.3d 991, 997 n.5 (9th Cir. 2016) (rejecting argument that the Court must consider financial hardship placed on the defendant); *United States v. Carlyle*, 712 Fed. Appx. 862, 864 (11th Cir. 2017) ("The impact of the fine on the individual defendant is not considered, and it is strongly presumed that the forfeiture is constitutional if the forfeiture amount is within the range of fines prescribed by Congress."); *United States v. Bikundi*, 926 F.3d 761, 796 (D.C. Cir. 2019) ("The Excessive Fines Clause does not make obvious whether a forfeiture is excessive because a defendant is unable to pay, and '[n]either the Supreme Court nor this court has spoken' on that issue.") (citation omitted).

¶86    The Court here also supports its conclusion by tethering it to § 46-18-231(3), MCA, the general sentencing statute, which states that "[t]he sentencing judge may not sentence an offender to pay a fine unless the offender is or will be able to pay the fine" and therefore "shall take into account the nature of the crime committed, the financial resources of the offender, and the nature of the burden that payment of the fine will impose."  The Court concludes that § 46-18-231(3), MCA, "codif[ies] the inquiry necessary to guarantee a fine is proportional," apparently holding this statute is itself universal and exclusive.  However, in *State v. Mingus*, 2004 MT 24, 319 Mont. 349, 84 P.3d 658, the Court, *en banc* and unanimously, held that there is a distinction between discretionary fines governed by § 61-8-731(3), MCA, and mandatory fines:

> In cases involving discretionary fines, when a defendant "has been found guilty of an offense for which a felony penalty of imprisonment could be imposed, the sentencing judge *may*, in lieu of or in addition to a sentence of imprisonment, impose a fine only in accordance with subsection (3)." Section 46-18-231(1)(a), MCA (emphasis added).  Section 46-18-231(3),

MCA, states that a "sentencing judge may not sentence an offender to pay a fine unless the offender is or will be able to pay the fine. In determining the amount and method of payment, the sentencing judge shall take into account the nature of the crime committed, the financial resources of the offender, and the nature of the burden that payment of the fine will impose." *This statutory provision does not apply to mandatory fines. When a fine is statutorily mandated, the court has no discretion as to whether to impose the fine, irrespective of the defendant's ability to pay.*

*Mingus*, ¶ 15 (emphasis added). The Court reasons that *Mingus* is now "clearly inconsistent" with § 46-18-231, MCA, and overturns it, thus discarding our precedential distinction between discretionary and mandatory fines. Opinion, ¶ 64. In my view, our decision in *Mingus* is not inconsistent with the statute and should not be overruled. The Legislature, pursuant to its primacy, which the Court acknowledges, Opinion, ¶ 50, has enacted both, and "[w]hen a general statute and a specific statute are inconsistent, the specific statute governs, so that a specific legislative directive will control over an inconsistent general provision." *Mosley v. Am. Express Fin. Advisors, Inc.*, 2010 MT 78, ¶ 20, 356 Mont. 27, 230 P.3d 479; *see also Nitro-Lift Techs., L.L.C. v. Howard*, 568 U.S. 17, 21, 133 S. Ct. 500, 504 (2012) (explaining that "the ancient interpretive principle that the specific governs the general" applies to provisions of "equivalent dignity"). Section 46-18-231(3), MCA, is a general sentencing statute that directs a judge to consider "the financial resources of the offender," amongst other factors. Section 61-8-731(3), MCA (2019), is a specific statute providing a sentencing range for a specific offense, a fifth or subsequent DUI offense. Because both statutes were laws enacted pursuant to the powers of the Montana Legislature, they are of equal dignity, and the specific statute should be applied above the general.

50

¶87 Justice Shea's concurrence takes the position that § 46-18-231(3), MCA, and § 61-8-731(3), MCA (2019), can be harmonized. Concurrence, ¶ 68. Under this harmonization, however, the defendant would be subject to the minimum fine under § 61-8-731(3), MCA (2019), only if a sentencing court determines the defendant has the current ability to pay it. In other words, the fine would be "mandatory" only if it is also ruled to be affordable, and thus, this attempt at reconciliation succeeds only by eliminating the mandatory nature of the fine. Harmonization cannot undermine the clear purpose of § 61-8-731(3), MCA (2019), as well as our holding that distinguishes mandatory fines from discretionary fines. *Mingus*, ¶ 15. Both statutes can instead be properly harmonized—and their natural reading preserved—by following our precedent and applying our interpretational statutes. Such a review renders § 61-8-731(3), MCA (2019) to be a narrower and specific exception to the otherwise governing rule that Montana courts consider a defendant's financial circumstances when imposing fines.

¶88 At bottom, the Court holds that all such statutes, providing a range of fines, for any offense, are necessarily facially unconstitutional if an express mechanism for assessing financial circumstances is not provided. To do so, it overrules longstanding precedent and strikes down a long-used statute. "Stare decisis is a fundamental doctrine that reflects this Court's concerns for stability, predictability, and equal treatment." *State v. Wolf*, 2020 MT 24, ¶ 21, 398 Mont. 403, 457 P.3d 218 (citing *Formicove, Inc. v. Burlington N., Inc.*, 207 Mont. 189, 194, 673 P.2d 469, 472 (1983)). We adhere to the doctrine so that, "above all, citizens may have some assurance that important legal principles involving their highest interests shall not be changed from day to day." *Wolf*, ¶ 21. I agree that there could be

51

cases where the imposition of a fine within such a statutory range may be excessive as applied to a particular defendant, who may raise this constitutional issue during the sentencing phase. But I disagree that the statute is unconstitutional in all cases.

¶89 Striking down a statute that has been utilized in our court system for 27 years on the ground it is facially unconstitutional is a disruption to the judiciary and also our democracy. *See United States v. Davis*, 139 S. Ct. 2319, 2337, (2019) ("A decision to strike down a 33-year-old, often-prosecuted federal criminal law because it is all of a sudden unconstitutionally vague is an extraordinary event in this Court.") (Kavanaugh, J., joined by Alito and Thomas, JJ., dissenting). It is especially so when the burden the Court has imposed for facial constitutionality is not mandated by our federal or state constitutions. I do not agree that the Court's exercise of judicial review is here compelled.

¶90 I would reject the facial challenge to § 61-8-731(3), MCA (2019), and affirm.

/S/ JIM RICE

Justice Beth Baker joins in the concurring in part and dissenting in part Opinion of Justice Rice.

/S/ BETH BAKER